UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOFRAN SALES, INC.,<br><br>                    Plaintiff,<br><br>v.<br><br>WATKINS AND SHEPARD<br>TRUCKING, INC.,<br><br>                    Defendant,<br><br>and<br><br>THE PNC FINANCIAL SERVICES GROUP,<br>INC.,<br><br>                    Trustee Process Defendant. | CIVIL ACTION NO. |

## VERIFIED COMPLAINT AND JURY DEMAND

### Introduction

1.      This is an action against Watkins and Shepard Trucking, Inc. ("Watkins") seeking damages, a temporary restraining order and injunctive relief for Watkins' breaches of contract, breach of the covenant of good faith and fair dealing, negligence, tortious interference with prospective business relationships, conversion, and violations of the Massachusetts Consumer Protection Act (Mass. Gen. Laws c. 93A), Montana Consumer Protection Act (Mont. Code Ann. § 30-14-101, *et seq.*), and California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*).

2.      This Verified Complaint also seeks relief in the form of an attachment on Watkins' funds held by the trustee process defendant, The PNC Financial Services Group, Inc. ("PNC"), with whom Watkins, upon information and belief, maintains a bank account.

Parties

3.      The plaintiff, Jofran Sales, Inc. ("Jofran"), is a corporation duly organized under the laws of the Commonwealth of Massachusetts with a principal place of business located at One Jofran Way, Norfolk, Norfolk County, Massachusetts.

4.      The defendant, Watkins, is a corporation duly organized under the laws of the State of Montana, with a principal place of business located at N. 6400 Hwy 10 W, Missoula, Montana.

5.      Watkins is registered to do business in Massachusetts and its registered agent in the Commonwealth is Joseph M. Klements, 15 Broad Street, 9th floor, Boston, Massachusetts.

6.      The trustee process defendant, PNC, is a corporation duly organized under the laws of the State of Pennsylvania, with a principal place of business located at 300 Fifth Avenue, Pittsburgh, Pennsylvania.

7.      PNC is registered to do business in Massachusetts and its registered agent in the Commonwealth is Corporation Service Company, 84 State Street, Boston, Massachusetts.

Jurisdiction and Venue

8.      This Court has original jurisdiction over this action by reason of diversity of citizenship between all parties pursuant to the provisions of Title 28, U.S.C. § 1332.  Per the allegations below, the amount in controversy far exceeds $75,000.

9.      Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the events or omissions giving rise to Jofran's claims against Watkins occurred in Massachusetts;

Watkins is subject to personal jurisdiction in Massachusetts; and Watkins' registered agent for service of process in Massachusetts is located in Boston, Massachusetts.

Background Facts

10.    Jofran is in the furniture sales business.  Jofran is a 41-year-old, family-owned wholesale supplier of popularly-priced furniture marketed to leading retailers throughout the United States.

11.    As part of its business, Jofran imports furniture from overseas and distributes it to its home furnishing store customers in the United States.

12.    The furniture is shipped to the United States in containers on cargo ships or freighters.

13.    Jofran's domestic stock is kept in warehouses to minimize retailer investment in store inventory and to allow for new floor samples to be sold.  Retailers rely upon Jofran to make product available to them either by truck or pick up within 48 hours of order.

14.    Watkins is a company that specializes in LTL (Less than Truck Load) freight management, warehousing inventory management systems, and container unloading and distribution of furniture and other products.  It claims to be the largest LTL specialized furniture carrier in the U.S.

15.    From 2008 through August 2015, Jofran received its cargo at a port in Tacoma, Washington.

16.    During this time period, Jofran had a Storage Pricing Agreement with Watkins, whereby Watkins was responsible for warehousing, processing, and storing the cargo once it reached the Tacoma port.

17.     The processing and storage included sending email notifications when containers arrived, emptying the containers into the Watkins' Washington warehouse, emailing empty container notifications to the dray carrier[1] and to Jofran, providing Jofran with manual receiving reports counting items in each container, sending Jofran electronic receiving reports generated from Watkins' scanning the goods into the warehouse, and providing Jofran with daily yard checks regarding the containers in the yard and their empty/full status. [2]

18.     Once the containers were emptied, and the receiving reports sent, Jofran knew what inventory was available to sell or ship to customers, and what was available for direct pick-up by customers.

19.     Once the furniture was received into the warehouse management system, Jofran could notify customers what furniture was available that could be ordered from the company.

20.     Jofran provided notice to some of its customers by making an on-hand inventory list available weekly, or by verifying availability of goods directly to customers and sales representatives via phone or email.

21.     Large customers such as TJ Maxx and HomeGoods would order furniture and then send their own shipping service to the warehouse to pick up the inventory. Watkins was responsible for staging the inventory to be picked up by these customers, confirming scheduled pick up appointments, and notifying Jofran when the inventory had been picked up.

22.     To stage the inventory for pick-up, Watkins would place all of the items for pick-up in one place to be loaded onto the customer's truck and itemize the inventory going out.

23.     For smaller customers who did not do their own pick-ups, Jofran had a separate shipping contract with Watkins. Customers could order furniture at any time, and once the

---

[1] A dray carrier is the trucking company hired to haul containers to/from the port.
[2] The "Yard" is the location where the containers are located after they are taken off the cargo ship.

furniture was in the warehouse, Jofran would direct Watkins to ship the orders of that furniture. Watkins would place the orders on one of its trucks and ship to the customer's destination. Watkins would notify Jofran via electronic transmission when the goods had shipped.

24.     Over time, the amount of furniture imported by Jofran increased in size, and Watkins' Washington warehouse did not have enough space for the inventory.

25.     By November, 2014 Jofran had outgrown the warehouse space available at the Washington facility.  Joff Roy, the president of Jofran advised Watkins that Jofran would need additional warehouse space.  Watkins advised Jofran that Watkins was planning on moving its existing west coast operation to the Inland Empire in Southern California.  On April 2, 2015 Watkins confirmed that operations would be moved to the Inland Empire in Southern California. See April 2015 Email Correspondence Between Jofran's Joff Roy and Watkins' Walt Ainsworth, a true and accurate copy of which is attached hereto as Exhibit A.

26.     That same day, Jofran advised Watkins that in order to consider moving to the Inland Empire warehouse, it needed to be operational in California by September 1, 2015, Jofran's initial stock would be a minimum of 125,000 to 175,000 cubic feet, that velocity would be significantly higher than that at the Washington warehouse, and that Jofran would need an option to expand the space used as necessary.  Ex. A.

27.     In response, Watkins advised that it would be in its new California warehouse by July 1, 2015, so September 1, 2015 would not be a problem.  Ex. A.

28.     These deadlines were important to Jofran because it makes arrangements to ship its overseas inventory many months before the cargo ships arrive in the United States.

29.     On April 7, Jofran confirmed with Watkins that it wanted to transition its inventory to the Southern California warehouse.  Ex. A.

30.    In May 2015, Watkins showed Jofran a warehouse on Beech Avenue in Fontana, California that Jofran determined would suit its needs, leading Jofran and Watkins to enter into a new Storage Pricing Agreement ("2015 Storage Pricing Agreement"). See 2015 Storage Pricing Agreement, a true and accurate copy of which is attached hereto as Exhibit B.

31.    The 2015 Storage Pricing Agreement Watkins and Jofran entered into provided for an effective date of September 1, 2015 until September 1, 2017. Ex. B.

32.    The 2015 Storage Pricing Agreement contained no early termination provision. It provides that the agreement automatically renews yearly unless one of the parties sends written notice to terminate at least six months prior to the next date of automatic renewal. Ex. B.

33.    Just like the original Storage Pricing Agreement, the 2015 Storage Pricing Agreement required that all product be racked. Ex. B.

34.    Racking is required both to facilitate the organization of Jofran's inventory and to protect Jofran's inventory from being damaged if items are incorrectly stacked on top of each other.

35.    Prior to the move to California, Watkins was well aware that Jofran was expecting the arrival of several overseas containers in California and needed to have the warehouse space operational and able to service Jofran's inventory in accordance with the 2015 Storage Pricing Agreement's September 1, 2015 start date.

36.    In addition, Watkins was well aware that Jofran was transporting inventory from the Washington warehouse to the California warehouse that would need to be received into the Beech Avenue warehouse, inventoried and processed.

37.    Despite this knowledge, Watkins' warehouse facilities were not ready on time, and containers sat unemptied on the lot.

38.     Jofran's inventory was first moved into Watkins' warehouse facilities in the last week of September.

39.     Although Watkins started moving Jofran's inventory into Watkins' warehouse facilities in the last week of September, Jofran was unable to ship most of its orders from the California warehouse until November 2015.  Watkins' delayed opening caused a backup of inventory that took a significant amount of time to unload into the warehouse and it took Watkins until early November 2015 to get caught up and to begin shipping Jofran's orders.

40.     In the interim, in October 2015, Watkins advised Jofran that it might move Jofran's inventory from the Beech Avenue warehouse to a nearby warehouse located at 11100 Hemlock Avenue in Fontana, California (the "Hemlock Avenue warehouse").  Having not been given any reason to believe that the Hemlock Avenue warehouse set-up would be any different from the original warehouse on Beech Avenue, Jofran did not object.

41.     Jofran was the only Watkins customer in the Hemlock Avenue warehouse.  All other customers remained in the Beech Avenue warehouse.

42.     After the Hemlock Avenue warehouse finally opened, Jofran learned that the facility was not racked, in violation of the 2015 Storage Pricing Agreement.

43.     Both Watkins' failure to open its warehouse facilities on time and the failure to rack the Hemlock Avenue warehouse led to delays in getting Jofran's products to its customers and to cancelled customer pickups.

44.     The failure to install racking in the Hemlock Avenue warehouse resulted in Jofran's inventory being physically damaged and contributed to inventory issues and disorganization that plagued Watkins' Hemlock warehouse facility during its operation.

45.     Once the Hemlock Avenue warehouse finally opened and became operational, Watkins failed to provide Jofran with accurate information regarding its inventory, shipments received and sent, and customer pickups.

46.     As Watkins had done when Jofran's operations were in Washington, Watkins was to provide Jofran with email notifications when containers arrived, email empty container notifications to the dray carrier and Jofran, provide Jofran with manual receiving reports counting items in each container, send Jofran electronic receiving reports generated from Watkins' scanning the goods into the warehouse, provide Jofran with daily yard checks regarding the containers in the yard and their empty/full status, and notify Jofran when orders shipped.

47.     When the Hemlock Avenue warehouse finally opened, Watkins delayed in setting up the necessary technology to provide Jofran with accurate inventory information.

48.     As a result, Watkins emptied containers and trailers into the Hemlock Avenue warehouse without doing manual receiving reports or sending electronic receiving transmissions to Jofran because the necessary technology was not yet operational.

49.     When Jofran's Chief Financial Officer and Director of Operations, Kristen Connell, visited the warehouse to address Watkins' inventory issues in early November 2015, she learned that when the facility opened, Watkins had not yet set up in its system many of the necessary SKU numbers, making it impossible for Watkins to scan inventory as it was unloaded from containers and placed in the warehouse.  She also observed that Watkins' warehouse management system was not correctly reflecting Jofran's inventory, that inventory was not in proper locations and not labeled correctly, that the facility's staff lacked training, and that Watkins had not shipped numerous orders Jofran had sent.

50.     As a result of Watkins' failure to properly handle and account for Jofran's inventory, Jofran did not know the scope or contents of its inventory and was unable to service customer order requests.  Jofran employees were regularly forced to chase down information from Watkins regarding what inventory was in the warehouse and spent significant time trying to correct errors in Watkins' records.

51.     Watkins' failure to properly handle and account for Jofran's inventory resulted in numerous inaccuracies in Watkins' records regarding the storage and transport of Jofran's inventory.

52.     In one instance in November 2015, there was a more than 7,000 carton discrepancy between Watkins' physical count of cartons in the warehouse and Watkins' warehouse management system's count of cartons in the warehouse.  See November 19, 2015 email from Watkins' Chris Mosley to Jofran's Kristen Connell, a true and accurate copy of which is attached here to as Exhibit C.  As this email points out, Watkins physical count was 25,224, while its electronic warehouse management system (WMS) count was 32,363, a difference of 7,139.  Ex. C.

53.     Watkins' conduct also resulted in multiple instances of shipping errors at the warehouse.  These included: Watkins' failing to pull and stage orders when requested (resulting in chargebacks from its customers for wasted time, fuel, and empty trailer space); Watkins' failing to ship staged orders because they put them into stock; shipments not matching paperwork; orders shipping late or not at all; and orders being loaded onto the wrong truck and lost.

54.     Watkins' conduct resulted in some of Jofran's inventory going missing, never to be recovered or accounted for.

55.     Each time inventory was unaccounted for and failed to appear on Jofran's weekly list of available furniture for customers to purchase, Jofran lost a sale.

56.     Watkins' failure to properly handle and account for Jofran's inventory and the resulting inaccuracies in Watkins' records regarding Jofran's inventory resulted in many of Watkins' invoices to Jofran being inaccurate.

57.     Beginning in October 2015, Jofran brought inaccuracies in Watkins' invoices to Watkins' attention and requested corrected invoices and/or backup documentation verifying the amounts charged.

58.     Watkins failed to provide Jofran corrected invoices that accurately reflected the fees due to Watkins.

59.     Watkins failed to provide to Jofran the requested backup documentation necessary to verify the amounts charged in Watkins' invoices.

60.     Despite Watkins' conduct, Jofran worked with Watkins in good faith to resolve the inventory issues, shipping errors, and invoicing issues described above.

61.     On December 30, 2015, Jofran asked Watkins when it planned to rack the Hemlock Avenue warehouse as promised in the 2015 Storage Pricing Agreement, pointing out that the bulk storage and lack of racking was contributing to the inventory problems at the facility.

62.     In response, Watkins told Jofran it was not obligated to rack the facility. After Jofran pointed out the 2015 Storage Pricing Agreement's language requiring racking, Watkins advised Jofran that they would have to renegotiate the contract.

63.     On or about January 8, 2016, Watkins sent Jofran a letter which purported to rescind the 2015 Storage Pricing Agreement due to Jofran's alleged material breach (the

"January 8 Letter"). See January 8, 2016 Letter from Trevor Uffelman to Joff Roy, a true and accurate copy of which is attached hereto as Exhibit D.

64.     The January 8 Letter alleges that as of that date, Jofran owed Watkins $250,728.33 in storage and freight charges, of which it claimed $185,021.78 was more than 20 days in arrears. Ex. D.

65.     The amounts alleged to be overdue in the January 8 Letter were inaccurate.  To the extent any invoices had not been paid when issued, it was because those invoices were inaccurate due to the inventory and shipping issues described above in Paragraphs 37-56, Watkins had been notified of the inaccuracy and Jofran had sought backup documentation  to substantiate the invoices which had not been received.   In addition, some of the invoices which Watkins claimed had not been paid, had actually never been sent to or received by Jofran.

66.     Watkins also back-dated invoices and then claimed that they were overdue when issued.

67.     Invoiced "in fees" were inaccurate and invoiced storage fees were based on inflated inventory levels.

68.     Jofran notified Watkins of the inaccuracies in its invoices and requested verification and correction of invoices on numerous occasions prior to January 8, 2016, but Watkins largely failed to provide corrected invoices and, in many cases, failed to respond at all to Jofran's inquiries.

69.     While Watkins was well aware of Jofran's multiple communications to Watkins disputing its invoices and requesting backup documentation, and knew that Jofran's serious questions about the accuracy of the invoices were the reason some invoices had not yet been

paid, Watkins' January 8 Letter alleges that, "[b]ecause of this sizable *(sic)* and persistent arrearage, it is clear that Jofran has no intention of performing its obligations...." Ex. D.

70.     Jofran never gave Watkins any reason to believe that Jofran had no intention of performing under the 2015 Storage Pricing Agreement or paying all charges that were accurate and actually due and owing.

71.     In the many years that the parties worked together there were never any unresolved billing disputes.

72.     At the time the January 8 Letter was sent, Watkins knew or had reason to know that Jofran intended to pay all amounts due to Watkins, once Watkins' invoices were corrected and verified.

73.     Despite this knowledge, Watkins' January 8 Letter sought to rescind the 2015 Storage Pricing Agreement and an LTL Transportation Services Agreement effective immediately, and notified Jofran that it expected all of Jofran's inventory to be out of Watkins' facilities within 60 days. Ex. D.

74.     In the January 8 Letter, Watkins also threatened to dispose of Jofran's remaining inventory. Ex. D.

75.     In communications following Jofran's receipt of the January 8 Letter, Watkins advised Jofran that it would refuse to allow any of Jofran's customers to pick up Jofran's inventory as of January 12, 2016 unless Jofran paid the alleged  arrearage identified in the January 8 Letter.

76.     Watkins knew that several of Jofran's large customers were scheduled to make pickups at the warehouse on January 12, 2016. Jofran's relationship with these customers had

already been negatively impacted by warehouse problems caused by Watkins' conduct at the warehouse over the past several months.

77.    Because Jofran needed its inventory at the warehouse to be available to its customers, Jofran negotiated with Watkins and entered into an agreement with Watkins on January 11, 2016 which stated in part that:

a.    On January 12, 2016, Jofran would pay Watkins $150,000.00 by wire transfer.

b.    In exchange for Jofran's payment of $150,000.00, Watkins would continue to operate under the terms of the Contracts, including but not limited to continuing to ship and receive Jofran inventory.

c.    Existing invoices.  Based on the ledger of Jofran's aging receivables forwarded by Watkins to Jofran via email on January 8, 2016, Jofran will provide Watkins with an itemized list of invoices that Jofran's records show have been paid, invoices that are disputed, and invoices Jofran never received by January 22, 2016.  Watkins will provide Jofran with all documentation necessary to verify all invoices identified by Jofran as disputed and provide copies of all invoices Jofran identifies as not received by February 5, 2016.

d.    Jofran and Watkins agreed to work in good faith and with best efforts to resolve their mutual disputes regarding the Contracts, and

e.    Neither Jofran nor Watkins waived any rights or obligations each may have under the Contracts, nor was this agreement meant to modify any terms of the Contracts.  See January 12, 2016 Letter from Maureen Mulligan to Trevor Uffelman, a true and accurate copy of which is attached hereto as Exhibit E.

78.     Pursuant to the January 11, 2016 agreement, Jofran paid Watkins $150,000.00 by wire transfer on January 12, 2016.

79.     Pursuant to the January 11, 2016 agreement, on January 22, 2016, Jofran provided Watkins with an itemized list of invoices that Jofran's records show had been paid, invoices that were disputed, and invoices Jofran never received.

80.     Without ever replying to Jofran's January 22, 2016 letter requesting additional information (despite an agreement to do so), on January 25, 2016, Watkins sent Jofran a letter indicating that, despite the communications that had transpired between Watkins and Jofran since the January 8, 2016 letter and the $150,000 payment on January 12, 2016, Watkins still considered Jofran to be in "material breach of the contract." See January 25, 2016 Letter from Trevor Uffelman to Maureen Mulligan and Joff Roy, a true and accurate copy of which is attached hereto as Exhibit F.

81.     In that same letter, Watkins proposed entering into a new storage agreement and "simplified" pricing agreement for the storage and servicing of Jofran's inventory in California. The proposed new contract terms significantly increased the cost to Jofran for the same services already contracted for in the 2015 Storage Pricing Agreement. Ex. F.

82.     The new Storage Pricing proposal also suggested warehousing at a new location.

83.     On January 29, 2016, Jofran advised Watkins before moving forward with any potential new arrangement with Watkins, the parties needed to resolve the existing dispute over outstanding invoices and Jofran's losses resulting from Watkins' warehousing issues during September to December 2015. Jofran's January 29 correspondence outlined various forms of damages sustained by Jofran as a result of Watkins' conduct. See January 29, 2016 Letter from

Maureen Mulligan to Trevor Uffelman, a true and accurate copy of which is attached hereto as Exhibit G.

84.     On February 3, 2016, Watkins served Jofran with a complaint that had been filed in Montana State Court on January 19, 2016 which sought to rescind the 2015 Storage Pricing Agreement.  Jofran has moved to dismiss on personal jurisdiction grounds and a hearing on that motion is scheduled for July 14, 2016.

85.     Also on February 3, 2016, Watkins advised Jofran that it was "no longer interested in salvaging any business relationship" with Jofran and that Jofran "need[ed] to secure alternate warehousing [by March 8, 2016.]"  See February 3, 2016 Email from Trevor Uffelman to Maureen Mulligan, a true and accurate copy of which is attached hereto as Exhibit H.

86.     That same email indicated that Watkins would not accept any new inventory from Jofran's containers on the water.  "We understand that Jofran has a number of containers on the water. Plans need to start to divert them to another facility."  Ex. H.

87.     Sometime after Jofran received Watkins' January 8 Letter seeking to rescind the 2015 Storage Pricing Agreement, it learned that Watkins' lease for the Hemlock Avenue warehouse where Jofran's inventory was stored (pursuant to the 2015 Storage Pricing Agreement with a two-year term) was a month-to-month lease that could be terminated by Watkins or its landlord on 60-days' notice.

88.     On February 12, 2016, Watkins informed Jofran that it expected to receive a 60-day termination notice from its landlord for the Hemlock Avenue warehouse by the end of February.  As a result, Jofran would have 60 days from that notice to get its inventory out of the Hemlock Avenue warehouse.

89.     It became clear that Watkins entered into a two-year agreement with Jofran while having only a month-to-month lease on a warehouse for storage.  In addition, unbeknownst to Jofran, during the time Watkins was forcing Jofran out of the Hemlock Avenue warehouse, Watkins was negotiating a sale of the company.

90.     Upon information and belief, Watkins' conduct with respect to the 2015 Storage Pricing Agreement, the warehouse and transportation services Watkins provided to Jofran, and Watkins' attempts to rescind the 2015 Storage Pricing Agreement and end its contractual obligations to Jofran were motivated by its desire to get out of a business deal that had turned out to not be profitable for Watkins, and not by a genuine belief that Jofran was in breach.  Watkins' stated reasons for rescission were pretextual.

91.     In early March 2016, Jofran's Kristen Connell travelled from Massachusetts to California to tour potential warehouse facilities.

92.     On March 8, 2016, Watkins forwarded to Jofran a notice from the property manager for the Hemlock Avenue warehouse that the landlord of the Hemlock Avenue warehouse was terminating Watkins' lease there as of May 8, 2016.

93.     As a result of the March 8, 2016 termination notice and despite the fact that Jofran had not materially breached the 2015 Storage Pricing Agreement, Jofran was forced to find another warehouse to store and service its inventory within 60 days.

94.     This short timeframe put Jofran at a disadvantage with respect to negotiating a financially advantageous agreement for the storage and servicing of Jofran's inventory.

95.     As a result, the agreement Jofran ultimately entered into with a third party for the storage and servicing of its inventory at a different facility as of May 2016 is more costly to

Jofran than the Storage Pricing Agreement with Watkins, had Watkins properly performed under its two-year term.

96.     Jofran has learned that Watkins was recently acquired by another entity, Schneider National Inc., a trucking company. See June 2, 2016 *Wall Street Journal* article, a true and accurate copy of which is attached hereto as Exhibit I.

97.     Jofran has suffered and continues to suffer harm and damages as a consequence of Watkins' conduct. An initial analysis of Jofran's damages incurred to date totals $658,301. This amount is based on Jofran's initial calculations of its minimum damages and is likely to increase. A detailed damages summary is attached hereto as Exhibit J. Jofran's damages include, but are not limited to:

   f. At least $105,055 in container detention charges, bobtail charges, fuel surcharges, and excess chassis rental charges caused by the Hemlock Avenue warehouse's delayed opening. A detailed breakdown of the damages incurred due to the delayed opening is attached as Exhibit K.

   g. At least $16,959 in lost and/or damaged inventory. At least one order was loaded onto the wrong truck and never recovered. Other inventory was damaged as a result of the failure to rack. A detailed breakdown of the damages incurred due to lost and/or damaged inventory is attached as Exhibit L.

   h. At least $55,902 in moving expenses. As a result of being forced out of the Hemlock Avenue warehouse, Jofran incurred significant moving expenses in connection with moving its voluminous inventory to a new facility. A

detailed breakdown of the damages incurred as a result of the move is attached as Exhibit M.

i.  At least $12,288 due to shipping issues and customer chargebacks to Jofran resulting from Watkins' errors.  On multiple occasions, Jofran was charged fees by its customers when they had to wait for orders at the warehouse, come back later, or take incomplete shipments because Watkins was not ready to ship.  A detailed breakdown of these damages is attached as Exhibit N.

j.  At least $8,282 in travel expenses.  Jofran representatives were forced to travel to California to address the warehousing, shipping, and invoicing issues at the Hemlock Avenue warehouse, to find a new facility to store and service Jofran's inventory, and to oversee the move of Jofran's inventory from the Hemlock Avenue warehouse to a new facility.   A detailed breakdown of the travel expenses incurred is attached as Exhibit O.

k.  At least $19,308 in damages to due billing errors.  A detailed breakdown of these damages is attached as Exhibit P.

l.  At least $84,000 in increased storage costs.  Jofran's agreement with the new warehouse facility that replaced Watkins in April 2016 is more costly to Jofran than the Storage Pricing Agreement it had negotiated with Watkins, had Watkins performed as agreed under the two-year term of the Storage Pricing Agreement.  A detailed breakdown of the increased storage costs is attached as Exhibit Q.

m.  At least $356,507 in lost net profit.  Jofran had several customers who did weekly pickups.  During the time period when the warehouse was not open,

these weekly pickups did not happen, resulting in lost sales. Other Jofran

customers advised that they wanted to purchase more product from Jofran, but

that they would not do so because of Watkins' conduct and unreliability. A

detailed breakdown of lost net profit is attached as Exhibit R.

n. Lost good will with customers. Many customers complained to Jofran about

instances when Watkins was not ready to ship to them and shipping errors.

o. Disruption to Jofran's day-to-day business operations. Watkins' conduct

required Jofran to devote an inordinate amount of time to seeking correct

invoices and backup documentation from Watkins, addressing customer

complaints, and securing a new warehouse.

98.     Watkins' conduct has been knowing and willful in violation of its contractual

obligations and in violation of the Massachusetts Consumer Protection Act (Mass. Gen. Laws c.

93A), Montana Consumer Protection Act (Mont. Code Ann. § 30-14), and California Unfair

Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq*.).

Causes of Action

Count I
(Breach of Contract)

99.     Jofran repeats and realleges all of its preceding allegations.

100.    Watkins' actions and conduct summarized above constitute a breach of Watkins'

contractual obligations to Jofran.

101.    Because of Watkins' breaches, Jofran has suffered harm and damages.

102.    Jofran is entitled to and demands monetary and equitable relief from Watkins.

Count II
(Violation of Implied Covenant of Good Faith and Fair Dealing)

103.   Jofran repeats and realleges all of its preceding allegations.

104.   The contractual obligations undertaken by Watkins to Jofran include an obligation of good faith and fair dealing.  The actions and conduct of Watkins as summarized above constitute violations of Watkins' obligation of good faith and fair dealing.

105.   Because of Watkins' violations of its obligation of good faith and fair dealing, Jofran has suffered harm and damages.

106.   Jofran is entitled to and demands monetary and equitable relief from Watkins.

Count III
(Negligence)

107.   Jofran repeats and realleges all of its preceding allegations.

108.   Watkins owed a duty of care to Jofran in its provision of warehousing and transportation services to Jofran.

109.   Through its actions and conduct as summarized above, Watkins breached its duty to Jofran.

110.   As a result of Watkins' breach, Jofran has suffered harm and damages.

Count IV
(Tortious Interference with Prospective Business Relationship)

111.   Jofran repeats and realleges all of its preceding allegations.

112.   Jofran has ongoing business relationships with numerous home furnishing store customers to which Jofran sells furniture.

113.   It was highly probable that these home furnishing stores would continue to purchase furniture from Jofran in the future.

114.    Watkins knew about Jofran's prospective business dealings with these home furnishing stores and the expectation that they would purchase furniture from Jofran in the future and, through its intentional conduct, prevented these home furnishing stores from purchasing furniture from Jofran.

115.    Watkins' interference with Jofran's prospective business relationships with Jofran's home furnishing store customers was improper in motive or in means. Watkins' intentionally breached the Storage Pricing Agreement in order to pressure Jofran to enter into a new contract.

116.    Jofran was harmed by Watkins' conduct.

Count V
(Violation of Mass. Gen. Laws c. 93A)

117.    Jofran repeats and realleges all of its preceding allegations.

118.    The actions and conduct of Watkins summarized above constitute violations of Mass. Gen. Laws c. 93A, §§ 2 and 11.

119.    Watkins' actions and conduct summarized above was unfair and deceptive.

120.    As a consequence of Watkins' actions and conduct summarized above, Watkins has caused Jofran to suffer harm and damage.

121.    Jofran is entitled to compensatory damages, multiple damages, attorneys' fees, costs, and injunctive relief.

Count VI
(Violation of Montana Consumer Protection Act, Mont. Code Ann. § 30-14-101, *et seq.*)

122.    Jofran repeats and realleges all of its preceding allegations.

123.    The actions and conduct of Watkins summarized above constitute violations of the Montana Consumer Protection Act, Mont. Code Ann. § 30-14.

124.    Watkins' actions and conduct summarized above was unfair and deceptive.

125.   As a consequence of Watkins' actions and conduct summarized above, Watkins' has caused Jofran to suffer harm and damage.

126.   Jofran is entitled to compensatory damages, multiple damages, attorneys' fees, costs, and injunctive relief.

Count VII
(Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*)

127.   Jofran repeats and realleges all of its preceding allegations.

128.   The actions and conduct of Watkins summarized above constitute violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*

129.   Watkins' conduct was unfair and deceptive.

130.   As a consequence of Watkins' actions and conduct summarized above, Watkins' has caused Jofran to suffer harm and damage.

131.   Jofran is entitled to compensatory damages, multiple damages, attorneys' fees, costs, and injunctive relief.

Count VIII
(Temporary Restraining Order and Preliminary Injunction)

132.   Jofran repeats and realleges all of its preceding allegations.

133.   Jofran has learned that Watkins was recently acquired by another entity, Schneider National Inc., a trucking company.

134.   Jofran is entitled to a preliminary injunction preventing Watkins from depleting and/or distributing its assets which would satisfy any judgment Jofran obtained against Watkins in this civil action.

135.   Given the recent acquisition of Watkins by Schneider National, Inc., there is a reasonable likelihood that, unless the temporary restraining order and preliminary injunction are granted, Watkins will deplete and/or distribute its assets which would satisfy a judgment.

136.     Without a preliminary injunction, Jofran will suffer irreparable harm if Watkins' assets are depleted and/or distributed, leaving Jofran with no way of collecting on a judgment.

137.     Jofran has a likelihood of success on the merits of its claims in this civil action.

138.     As explained above, Jofran expects to obtain a judgment against Watkins in the amount of at least $658,301.

139.     The granting of a preliminary injunction would cause no injury to Watkins.

Count IX
(Trustee Process – PNC)

140.     Jofran repeats and realleges all of its preceding allegations.

141.     Watkins maintains a bank account at PNC Bank, New Jersey, a subsidiary of The PNC Financial Services Group, Inc.

142.     Until Watkins severed its relationship with Jofran earlier this year, Jofran remitted payment to Watkins via electronic transfers to this bank account.

143.     Jofran has meritorious causes of action against Watkins and there is a reasonable likelihood that a judgment will be recovered in the amount of at least $658,301.

144.     Upon information and belief, Watkins' PNC account contains funds that would satisfy, at least in part, the judgment Jofran expects to obtain against Watkins.

145.     Jofran is unaware of any insurance coverage which would satisfy a judgment in this matter.

146.     Given the recent acquisition of Watkins by Schneider National, Inc., there is a reasonable likelihood that, unless the attachment is granted, Watkins will transfer the funds in the account.

## DEMAND FOR RELIEF

For all of the foregoing reasons, Jofran demands:

a.        Compensatory damages;

b.        Multiple damages;

c.        Attorneys' fees and costs;

d.        A preliminary injunction and restraining order preventing Watkins from depleting and/or distributing assets in the amount of $658,301 which would satisfy the minimum judgment Jofran expects to obtain against Watkins in this civil action.

e.        An Order attaching by Trustee Process all of the goods, effects and credits of Watkins in the hands or possession of PNC in the amount of $658,301.

f.        Such other and further relief as the Court may deem just.

THE PLAINTIFF DEMANDS A JURY TRIAL.

JOFRAN SALES, INC.
By its attorneys,

/s/ Jennifer R. Kiefer
Maureen Mulligan, BBO #556482
Jennifer R. Kiefer, BBO #670033
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210-2261
Tel. (617) 951-2100
Fax. (617) 951-2125
mmulligan@peabodyarnold.com
jkiefer@peabodyarnold.com

Dated: June 21, 2016

## VERIFICATION

I, Kristen Connell, Chief Financial Officer and Director of Operations for Jofran Sales, Inc., state that I have read the foregoing Verified Complaint, that I have personal knowledge of the facts set forth therein, except as to those facts which are stated upon information and belief, and that the facts stated therein are true and that no material facts have been omitted therefrom.

Signed under the penalties of perjury this __21st__ day of June, 2016.

_Kristen Connell_
Kristen Connell, CPA, CGMA
Chief Financial Officer and Director of Operations
Jofran Sales, Inc.
Duly Authorized

959539_1
16190-200176