UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

JOFRAN SALES, INC.,

                Plaintiff,

v.

WATKINS AND SHEPARD
TRUCKING, INC.,

                Defendant,

and

THE PNC FINANCIAL SERVICES GROUP,
INC.,

                Trustee Process Defendant.

CIVIL ACTION NO.

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION, RESTRAINING ORDER AND
TRUSTEE PROCESS ATTACHMENT**

## INTRODUCTION

The plaintiff, Jofran Sales, Inc. ("Jofran"), seeks a preliminary injunction and restraining

order preventing the defendant, Watkins and Shepard Trucking, Inc. ("Watkins"), from

transferring or otherwise disposing of its assets in the amount of $658,301 until this litigation

concludes.  This injunction is necessary because Watkins (a privately held company) has recently

been sold to a third party.  There is a grave risk that the sale proceeds will be distributed to

Watkins' owners or the company will wind down before this litigation concludes.  For the same

reasons, Jofran seeks an Order attaching by trustee process all of the goods, effects and credits of

Watkins in the hand of the trustee process defendant, The PNC Financial Services Group, Inc. ("PNC"), in the amount of $658,301.  Upon information and belief, Watkins maintains a bank account with PNC.  Given the recent acquisition of Watkins by a third party, there is a reasonable likelihood that, unless an attachment is granted, Watkins will transfer the funds in the account.

Jofran is a family-owned wholesale supplier of furniture to leading retailers throughout the United States.  Verified Compl., ¶ 10.  Watkins is a company that specializes in freight management, warehouse inventory management systems, container unloading, and distribution of furniture and other products.  Id. at ¶ 14.  Jofran and Watkins, long term business partners, entered into a two-year agreement whereby Watkins agreed to warehouse and process Jofran's oversees furniture shipments upon receipt in the United States.  Id. at ¶¶ 30-31.  This included emptying, processing and storing containers of furniture that arrived by ship to a Southern California port, creating an inventory of  items for sale to customers and preparing furniture orders for pick-up by Jofran customers once orders were received.  Id. at ¶¶ 17-46.  Watkins failed to open its warehouse according to the agreed upon schedule in the contract, leaving Jofran's overseas shipments sitting in containers on the lot rather than unloaded and inventoried into Watkins' warehouse where they could be sold to customers.  Id. at ¶¶ 35-37.  Once the warehouse finally opened, Watkins failed to adequately invoice and account for the furniture and failed to rack the facility resulting in damaged goods that Jofran was unable to sell.  Id. at ¶¶ 42-52.

In addition, although the parties signed a two-year contract for services, Watkins only entered into a month-to-month lease with a 60-day termination notice provision for the warehouse it was using to store Jofran's inventory.  Id. at ¶¶ 87-89.  Ultimately, the warehouse

owner gave notice to terminate prior to the end of Watkins' contract with Jofran.  Id. at ¶ 92.

This required Jofran to disrupt its distribution of furniture and locate new warehouse space only

six months after transferring its business to Watkins' California warehouse.  Id. at ¶ 93.  The

short time frame in which Jofran had to relocate resulted in a new warehouse agreement at a

much higher price. Id. at ¶ 95.

Watkins' actions have caused Jofran significant damage.  Id. at ¶ 97.  Jofran has recently

learned that Watkins has been sold.  Id. at ¶ 96.  Without an injunction preventing the

distribution of the sale proceeds or an attachment on the collection of the remaining accounts

receivable, Jofran will be left without a remedy for the damages caused by Watkins' actions.

## FACTS

Jofran is a 41 year old family owned wholesale supplier of popular furniture to market to

retailers throughout the United States.  Verified Compl., ¶ 10.  The furniture is shipped to Jofran

in the United States in containers on cargo ships Id. at ¶ 12.  Watkins is a company that

specializes in LTL (Less than Truck Load) freight management, warehousing inventory

management systems, container unloading and distribution of furniture and other products.  Id. at

¶ 14.  It claims to be the largest LTL specialized furniture carrier in the U.S.  Id.

From 2005 through August 2015, Jofran received its cargo at a port in Washington.  Id. at

¶ 15.  During this time Jofran had a Storage Pricing Agreement with Watkins, whereby Watkins

was responsible for processing and storing the cargo once it reached the Washington port.  Id. at

¶ 16.  The processing and storage included sending email notifications when containers arrived,

emptying the containers into the Watkins' Washington warehouse, emailing empty container

notifications to the dray carrier[1] and Jofran, providing Jofran with manual receiving reports

counting items in each container, sending Jofran electronic receiving reports generated from

---

[1] A dray carrier is the trucking company hired to haul containers to/from the port.

Watkins scanning the goods into the warehouse, and providing Jofran with daily yard checks regarding the containers in the yard and their empty/full status.[2]  Id. at ¶ 17.  Once the containers were emptied and the receiving reports sent, Jofran knew what inventory was available to sell to customers, ship to customers or what was available for direct pick-up by customers.  Id. at ¶ 18.  Once the furniture was received into the warehouse management system, Jofran could notify customers what furniture was available that could be ordered from the company.  Id. at ¶ 19.

Jofran provided notice to some of its customers by making an on-hand inventory list available weekly, or by verifying availability of goods directly to customers and sales representatives via phone or email.  Id. at ¶ 20.  Large customers such as TJ Maxx and HomeGoods would order furniture and then send their own shipping service to the warehouse to pick up inventory.  Id. at ¶ 21.  Watkins was responsible for staging the inventory to be picked up by these customers.  Id.  For Jofran's smaller customers, Watkins would place the orders on one of its trucks and transport to the customer's destination.  Id. at ¶ 23.

Over time, the amount of furniture imported by Jofran increased in size and the Washington warehouse did not have enough space for the inventory.  Id. at ¶ 24.  By November 2014 Jofran had outgrown the available warehouse space at Watkins' Washington warehouse.  Id. at ¶ 25.  Joff Roy, the President of Jofran, advised Watkins that Jofran would need additional warehouse space.  Id.  At that time, Watkins advised Jofran that it was planning on moving its existing west coast operations to the Inland Empire in Southern California.  Id.  Jofran told Watkins that it would be interested in moving to the California warehouse if Watkins could guarantee operation by September 1, 2105 and could accommodate Jofran's increased inventory in the range of 125,000 to 175,000 cubic feet with additional room for expansion.  Id. at ¶ 26.

---

[2] The 'Yard' is the location where the containers are located after they are taken off the cargo ship.

When Watkins confirmed that those parameters were acceptable, Jofran confirmed that it wanted to transition to the California warehouse. <u>Id.</u> at ¶¶ 27, 29.

In May 2015, Watkins showed Jofran a warehouse on Beech Avenue in Fontana, California that Jofran determined would suit its needs, leading Jofran and Watkins to enter into a new Storage Pricing Agreement ("2015 Storage Pricing Agreement"). <u>Id.</u> at ¶ 30. The 2015 Storage Pricing Agreement Watkins provides for an effective date of September 1, 2015 until September 1, 2017. <u>Id.</u> at ¶ 31. The 2015 Storage Pricing Agreement contains no early termination provision. <u>Id.</u> at ¶ 32. It provides that it automatically renews yearly unless one of the parties sends written notice to terminate at least six months prior to the next date of automatic renewal. <u>Id.</u> Just like the original Storage Pricing Agreement, the 2015 Storage Pricing Agreement requires that all product be racked. <u>Id.</u> at ¶ 33. Racking is required to both facilitate the organization of Jofran's inventory and protect Jofran's inventory from being damaged if items are improperly stacked on top of each other. <u>Id.</u> at ¶ 34.

Prior to the move to California, Watkins was well aware that Jofran was expecting the arrival of several overseas containers in California, would be receiving inventory in greater quantities than previously warehoused in Washington and needed to have the warehouse space operational September 1, 2015. <u>Id.</u> at ¶ 35. In addition, Watkins was well aware that Jofran was transporting inventory from the Washington warehouse to the California warehouse that would need to be inventoried and processed. <u>Id.</u> at ¶ 36.

Despite this knowledge, Watkins' warehouse facilities were not ready on time. <u>Id.</u> at ¶ 37. Jofran's cargo deliveries sat on the lot without being emptied. <u>Id.</u> Jofran's inventory was not moved into Watkins' warehouse facilities until the last week of September. <u>Id.</u> at ¶ 38. However, even when the inventory was finally transferred into the California warehouse in the

last week of September, Jofran still could not ship the inventory to its customers because it was not properly cataloged or entered into the electronic system for tracking.  Id. at ¶ 39.  In other words, Jofran could not make inventory available for orders by its customers.

In October 2015, Watkins asked Jofran if it would be agreeable to moving Jofran's inventory from the Beech Avenue warehouse (where the inventory was unloaded in the last week of September) to another Watkins warehouse located at 11100 Hemlock Avenue in Fontana, California (the "Hemlock Avenue warehouse").  Id. at ¶ 40.  Having not been given any reason to believe that the Hemlock Avenue warehouse set-up would be any different from the original warehouse on Beech Avenue, Jofran did not object.  Id.  Jofran was the only Watkins customer in the Hemlock Avenue warehouse.  Id. at ¶ 41.  All other customers remained in the Beech Avenue warehouse.  Id.

After the Hemlock Avenue warehouse finally opened, Jofran learned that the facility was not racked, in violation of the 2015 Storage Pricing Agreement.  Id. at ¶ 42.  Both Watkins' failure to open its warehouse facilities on time and the failure to rack the Hemlock Avenue warehouse led to delays in getting Jofran's products to its customers and cancelled customer pickups.  Id. at ¶ 43.  The failure to rack the Hemlock Avenue warehouse resulted in Jofran's inventory being physically damaged and contributed to inventory issues and disorganization that plagued Watkins' Hemlock warehouse facility during its operation.  Id. at ¶ 44.

Watkins delayed in setting up the necessary technology to provide Jofran with accurate inventory information.  Id. at ¶ 47.  As a result, Watkins emptied containers into the Hemlock Avenue warehouse by doing manual receiving reports and did not send electronic receiving transmissions to Jofran because the necessary technology was not yet operational.  Id. at ¶ 48. When Jofran's Chief Financial Officer and Director of Operations, Kristen Connell, visited the

warehouse to address Watkins' inventory issues in early November 2015, she learned that when the facility opened, Watkins had not yet set up in its system many of the necessary SKU numbers, making it impossible for Watkins to scan inventory as it was unloaded from containers and placed in the warehouse.  Id. at ¶ 49.  She also observed that Watkins' warehouse management system was not correctly reflecting Jofran's inventory, that inventory was not in proper locations and not labeled correctly, that the facility's staff lacked training, and that Watkins had not shipped numerous orders Jofran had sent.  Id.

As a result of Watkins' failure to properly handle and account for Jofran's inventory, Jofran did not know the scope or contents of its inventory and was unable to service customer order requests.  Id. at ¶ 50.  Watkins' failure to properly handle and account for Jofran's inventory resulted in numerous inaccuracies in Watkins' records regarding the storage and transport of Jofran's inventory.  Id. at ¶ 51.  Watkins' conduct also resulted in multiple instances of shipping errors at the warehouse.  Id. at ¶ 53.  Each time that inventory was unaccounted for and failed to appear on Jofran's weekly list of available furniture for customers to purchase, Jofran lost a sale.  Id. at ¶ 55.

Watkins' failure to properly handle and account for Jofran's inventory and the resulting inaccuracies in Watkins' records regarding Jofran's inventory resulted in many of Watkins' invoices to Jofran being inaccurate.  Id. at ¶ 56.  Beginning in October, 2015, Jofran brought inaccuracies in Watkins' invoices to Watkins' attention and requested corrected invoices and/or backup documentation verifying the amounts charged.  Id. at ¶ 57.  Watkins failed to provide Jofran corrected invoices that accurately reflect the fees due to Watkins.  Id. at ¶ 58.  Watkins failed to provide to Jofran the requested backup documentation necessary to verify the amounts charged in Watkins' invoices.  Id. at ¶ 59.  Despite Watkins' conduct, Jofran worked with

Watkins in good faith to resolve the inventory issues, shipping errors, and invoicing issues described above.  Id. at ¶ 60.

On December 30, 2016 Kristen Connell had a conversation with Walt Ainsworth and told him that many of the problems regarding inventory accountability and damage could be solved if Waktins would rack the Hemlock warehouse facility as required by the contract.  Id. at ¶ 61; see 2015 Storage Pricing Agreement (which requires racking), attached to Verified Complaint as Exhibit B.  Ainsworth told Connell that the contract did not require racking and if Jofran insisted on racking they would need to renegotiate the price of the contract.  Verified Compl., ¶ 62.

Rather than provide the racking that was contractually required or discuss with Jofran why they could not rack the warehouse, on or about January 8, 2016, Watkins sent Jofran a letter which purported to rescind the 2015 Storage Pricing Agreement due to Jofran's alleged material breach (the "January 8 Letter").  Id. at ¶ 63.  The January 8 Letter alleged that Jofran was in arrears on the payment of its storage and freight charges.  Id. at ¶ 64.  The amounts alleged to be overdue in the January 8 Letter were inaccurate.  Id. at ¶ 65.  To the extent any invoices had not been paid, it was because those invoices were either inaccurate due to the inventory and shipping issues described above or lacking backup documentation requested by Jofran.  Id.  Jofran had previously notified Watkins of the inaccuracies in its invoices and requested verification and correction of invoices on numerous occasions prior to January 8, 2016, but Watkins largely failed to provide corrected invoices and, in many cases, failed to respond at all to Jofran's inquiries.  Id. at ¶¶ 65-68.

While Watkins was well aware of Jofran's multiple communications to Watkins disputing its invoices and requesting backup documentation, and knew that Jofran's serious questions about the accuracy of the invoices were the reason some invoices had not yet been

paid, Watkins' January 8 Letter claimed, without any basis, that Jofran had no intention of performing its obligations and therefore the contract was rescinded.  Id. at ¶ 69.  Jofran never gave Watkins any reason to believe that Jofran had no intention of performing under the 2015 Storage Pricing Agreement or paying all charges that were accurate and actually due and owing. Id. at ¶ 70.  In the many years that the parties worked together there were never any unresolved billing disputes.  Id. at ¶ 71.

In the January 8 Letter, Watkins instructed Jofran to be out of the warehouse in 60 days and  also threatened to dispose of Jofran's remaining inventory.  Id. at ¶¶ 73-74.  In communications following Jofran's receipt of the January 8 Letter, Watkins advised Jofran that it would refuse to allow any of Jofran's customers to pick up Jofran's inventory as of January 12, 2016 unless Jofran paid the arrearage identified in the January 8 Letter.  Id. at ¶ 75.  Watkins knew that several of Jofran's large customers were scheduled to make pickups at the warehouse on January 12, 2016.  Id. at ¶ 76.  Jofran's relationship with these customers had already been negatively impacted by warehouse problems caused by Watkins' conduct at the warehouse over the past several months.  Id.  Because Jofran needed its inventory at the warehouse to be available to its customers, Jofran negotiated with Watkins and entered into an agreement with Watkins on January 11, 2016 which stated in part that on January 12, 2016 Jofran would make a payment to Watkins of $150,000.00 by wire transfer on the disputed invoices with the understanding that Watkins would continue to work with Jofran to resolve the discrepancies in the invoices.  Id. at ¶ 77.  In order to accomplish the resolution, Jofran suggested that by January 22, 2016 it  provide Watkins with an itemized list of invoices that Jofran's records showed  had been paid, invoices that were disputed, and a list of Watkins claimed had been sent.  Id.  In return, Watkins agreed that on or before February 5, 2016 it would provide the requested

documentation necessary to verify all invoices identified by Jofran as disputed and provide copies of all invoices Jofran identified as not received.  Id.  Neither Jofran nor Watkins waived any rights or obligations each may have under the Contracts, nor was this agreement meant to modify any terms of the Contracts.  Id.

 Pursuant to the January 11, 2016 agreement, Jofran paid Watkins $150,000.00 by wire transfer on January 12, 2016.  Id. at ¶ 78.  Pursuant to the January 11, 2016 agreement, on January 22, 2016, Jofran provided Watkins with an itemized list of invoices that Jofran's records showed had been paid, invoices that were disputed, and invoices Jofran never received. Id. at ¶ 79.

Rather than respond in kind, and as had been agreed, on January 25, 2016, Watkins sent Jofran a letter indicating that, despite the communications that had transpired between Watkins and Jofran since the January 8, 2016 letter and the $150,000 payment on January 12, 2016, Watkins still considered Jofran to be in "material breach of the contract."  Id. at ¶ 80. Instead of providing the missing information that would allow Jofran to verify the charges, Watkins proposed entering into a new storage agreement and "simplified" pricing agreement for the storage and servicing of Jofran's inventory in California.  Id. at ¶ 81.  The proposed new contract terms significantly increased the cost to Jofran for the same services already contracted for in the 2015 Storage Pricing Agreement.  Id.  The new Storage Pricing proposal also suggested warehousing at a new location.  Id. at ¶ 82.  At this point in time Jofran had no idea that Watkins only had a month-to-month lease on the Hemlock location which could be terminated by Watkins or the warehouse owner on 60-days' notice.

On February 3, 2016, Watkins advised Jofran that it was "no longer interested in salvaging any business relationship" with Jofran and that Jofran "need[ed] to secure alternate

warehousing [by March 8, 2016.]" <u>Id.</u> at ¶ 85.  That same email indicated that Watkins would

not accept any new inventory from Jofran's containers on the water.  <u>Id.</u> at ¶ 86. This meant that

Jofran would have no place to store and process containers in transit that Watkins had previously

agreed to accept by the terms of the 2015 Storage Agreement.

On February 12, 2016, Watkins informed Jofran that it expected to receive notice from its

landlord for the Hemlock Avenue warehouse to vacate by the end of February and that Jofran

would have 60 days from that notice to get its inventory out of the Hemlock Avenue warehouse.

<u>Id.</u> at ¶ 88.  In addition, unbeknownst to Jofran, during the time Watkins was forcing it out of the

Hemlock Avenue warehouse, Watkins was negotiating a sale of the company.  <u>Id.</u> at ¶ 89.

Watkins' acquisition by another trucking company, Schneider National, Inc., was made public on

June 2, 2016.  <u>Id.</u> at ¶ 96.

In early March 2016, Jofran's Kristen Connell travelled from Massachusetts to California

to tour potential warehouse facilities.  <u>Id.</u> at ¶ 91.  On March 8, 2016, Watkins forwarded to

Jofran a notice from the property manager for the Hemlock Avenue warehouse that the landlord

of the Hemlock Avenue warehouse was terminating Watkins' lease there as of May 8, 2016.  <u>Id.</u>

at ¶ 92.  As a result of the March 8, 2016 termination notice and despite the fact that Jofran had

not materially breached the Storage Pricing Agreement, Jofran was forced to find another

warehouse to store and service its inventory within 60 days.  <u>Id.</u> at ¶ 93.  This short timeframe

put Jofran at a disadvantage with respect to negotiating a financially advantageous agreement for

the storage and servicing of Jofran's inventory.  <u>Id.</u> at ¶ 94.  As a result, the agreement Jofran

ultimately entered into with a third party for the storage and servicing of its inventory at a

different facility as of May 2016 is more costly to Jofran than the Storage Pricing Agreement

with Watkins, had Watkins properly performed under its two-year term.  <u>Id.</u> at ¶ 95.

Jofran has suffered and continues to suffer harm and damages as a consequence of Watkins' conduct. Id. at ¶ 97. An initial analysis of Jofran's damages incurred to date totals $658,301. Id. Detailed analyses of Jofran's initial damages calculations are attached to the Verified Complaint as Exhibits J-R and set forth in more detail in the Affidavit of Kristen Connell. In general terms, Jofran suffered damages which include, but are not limited to: (1) At least $105,055 in extra charges for Watkins' failure to timely unload the containers into the warehouse, see Verified Complaint Ex. K; (2) at least $16,959 in lost and/or damaged inventory, see Verified Complaint Exhibit L; (3) at least $55,902 in moving expenses, see Verified Complaint Exhibit M; (4) at least $12,288 due to shipping issues and customer chargebacks to Jofran resulting from Watkins' errors, see Verified Complaint Exhibit N; (5) at least $8,282 in travel expenses related to warehouse issues and to find a new facility, see Verified Complaint Exhibit O; (6) at least $19,308 in damages to due billing errors, see Verified Complaint Exhibit P; (7) at least $84,000 in increased storage costs, see Verified Complaint Exhibit Q; (8) at least $356,507 in lost net profit, see Verified Complaint Exhibit R.

The attached Affidavit of Kristen Connell, a Certified Public Accountant and Jofran's Chief Financial Officer and Director of Operations, provides a more detailed explanation of how the numbers in Exhibits J-R to the Verified Complaint were calculated. See Affidavit of Kristen Connell, submitted with this Motion.

## ARGUMENT

### I.     PRELIMINARY INJUNCTION STANDARD

A preliminary injunction should be granted in favor of Jofran because it can demonstrate that it is (1) likely to succeed on the merits, (2) will suffer irreparable injury if injunctive relief is not granted; and (3) the balancing of the equities lies in its favor. GTE Prods. v. Stewart, 414

Mass. 721 (1993); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980).  The material consideration in this inquiry is not the raw amount of irreparable harm the moving party might suffer, but rather the "risk of such harm in light of the party's chance of success on the merits."  Packaging Indus. Group, 380 Mass. at 617.  When the balance between the risks favors the moving party, the preliminary injunction should issue.

## II.   JOFRAN IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS[3]

### a.  Breach of Contract

To prove a breach of contract claim, Jofran must establish that: (1) a valid contract exists; (2) Jofran performed its obligations under the contract, or, because of the conduct of Watkins was excused performance; (3) Watkins breached the contract; and (4) Jofran suffered damages as a result of Watkins' breach.  Singarella v. City of Boston, 342 Mass. 385, 387 (1961).  Jofran can satisfy all of these elements required to prove a breach of contract claim.

In this case, there is no doubt that there was a contract between Jofran and Watkins.  See 2015 Storage Pricing Agreement attached to Verified Complaint as Exhibit B.  There is also no doubt that Watkins breached that agreement through its disgracefully poor operation of Jofran's California warehouse operations in September-December 2015.   As set out above and in the Verified Complaint, it is undisputed that Watkins' failure to open the California facilities by the date specified in the contract constitutes a breach of the 2015 Storage Agreement.  A breach of the 2015 Storage Agreement continued when Watkins failed to rack the Hemlock Avenue warehouse, resulting in damage to Jofran's inventory and inability to properly account for the

---

[3] This motion addresses only Jofran's claims for breach of contract and breach of the implied covenant of good faith and fair dealing, because Jofran's likelihood of success on these claims justifies the relief sought in this motion and the damages alleged in the Verified Complaint.  By not addressing Jofran's claims for tortious interference with prospective business relationships, negligence, violation of Mass. Gen. Laws c. 93A, violation of the Montana Consumer Protection Act, and violation of the California Unfair Competition Law in this motion, Jofran waives no arguments as to the validity of those claims.

inventory; failed to timely set up the technology to properly track inventory; and failed to properly stage inventory for pick-up by major customers. All of these actions resulted in additional costs to Jofran and lost sales to customers.

In addition, in asking Jofran to move to the Hemlock Avenue warehouse and failing to disclose to Jofran that Watkins only had a month-to-month lease in that warehouse, Watkins materially breached its obligation to provide warehouse space for the two-year term of the contract. Watkins' failure to provide Jofran with the information necessary to properly verify invoices for payment was also a breach of the agreement, as Jofran was unable to keep an accurate accounting or determine what amount on the invoices needed to be paid.

In defense of this motion, Watkins will most likely argue that Jofran breached the 2015 Storage Pricing Agreement and that Watkins has rescinded the contract.  But it is well settled law that a material breach by one party excuses the other party from further performance under the contract.  Petrangelo v. Pollard, 356 Mass. 696, 701-02 (1970).  In this matter, Watkins failed to perform from the very day the contract was scheduled to start. Watkins notified Jofran on January 8, 2016 that it was rescinding the 2015 Storage Pricing Agreement, purportedly because Jofran had failed to pay outstanding invoices, despite the fact that Watkins knew that any failure to pay invoices was due to Watkins' failure to provide accurate invoices and/or Watkins' failure to provide Jofran with back up documentation requested by Jofran to verify disputed invoices. Watkins was well aware of the inventory and shipping issues that had plagued the Hemlock Avenue warehouse since it opened in the fall of 2015 and the resulting invoice inaccuracies. Jofran had communicated with Watkins innumerable times over the months leading up to January 2016 in an effort to correct the erroneous invoices and/or verify invoices with backup documentation, so that Jofran could pay all amounts due.  Watkins, in turn, failed to correct the

invoices and failed to provide the requested backup documentation, only to then assert that

Jofran's failure to pay the disputed invoices was a material breach of the contract.  Watkins

placed Jofran in an untenable catch-22, whereby Watkins sought to hold Jofran in breach for not

paying invoices, while also not providing Jofran with the information it needed to pay the

amounts due.

Hindsight reveals that Watkins' attempts to rescind the 2105 Storage Pricing Agreement

and end its contractual obligations to Jofran were motivated by its desire to get out of a business

deal that had turned out to be problematic and not profitable for Watkins, not by a genuine belief

that Jofran was in breach.

Several facts suggest that Watkins stated reasons for rescission were pretextual.  Watkins

sent its January 8 rescission letter immediately after it apparently realized that it was obligated to

incur the cost of racking the Hemlock Avenue warehouse pursuant to the 2015 Storage Pricing

Agreement.  Verified Compl., ¶¶ 61-63.  On January 25, 2016, less than three weeks after

Watkins' purported to rescind the Storage Pricing Agreement because, as its January 8, 2016

letter alleged, Jofran clearly had "no intention of performing its obligations," Watkins was

suddenly willing to renegotiate the services it provided to Jofran at a higher rate.  Id. at ¶¶ 80-81.

Watkins' willingness to continue working with Jofran (assuming Jofran entered into a new

contract that was more profitable to Watkins) contradicts its January 8, 2016 assertion that Jofran

was a company unwilling to live up to its contractual obligations.  If Watkins truly believed the

allegations of its January 8, 2016 letter, its willingness to continue working with Jofran is

puzzling.  In addition, at the time of the January 8, 2016 letter, Watkins knew information about

the Hemlock Avenue warehouse that Jofran did not: that despite the two-year term of Jofran's

2015 Storage Pricing Agreement, the lease for the warehouse where Watkins was storing

Jofran's inventory could be terminated with just 60-days' notice from the landlord.  Id. at ¶¶ 87-89.  In addition, by early 2016, Watkins had surely already begun talks with Schneider National, Inc., the entity that acquired Watkins as of June 1, 2016, and Watkins' relationship with Jofran was, presumably, a liability.  Id. at ¶ 89.  Watkins viewed its contractual obligations to Jofran as a burden it needed to get rid of and, thus, sought to force Jofran into a situation where Watkins could argue that it had grounds to rescind the 2015 Storage Pricing Agreement.

Watkins also breached its contractual obligations to Jofran by essentially holding Jofran's inventory for ransom unless the unreasonable demands set forth in Watkins' January 8, 2016 rescission letter were met.  Watkins threatened to refuse to allow any of Jofran's customers to pick up inventory as of January 12, 2016 unless Jofran paid an arrearage Watkins knew was based on inaccurate and/or unverified invoices, and threatened to dispose of Jofran's inventory to satisfy that inaccurate arrearage if it was not paid within 10 days.  Id. at ¶¶ 74-75.

In sum, Watkins manufactured a false breach of the 2015 Storage Pricing Agreement by Jofran, rescinded the 2015 Storage Pricing Agreement without legitimate grounds to do so, and then made it abundantly clear that it would only perform the already-contracted-for services if Jofran paid Watkins more money pursuant to a new contract.  After Jofran understandably declined, Watkins advised Jofran that the Hemlock Avenue warehouse's landlord had triggered the 60-day termination provision in Watkins' lease and that Jofran had to find someone else to store and service its inventory and be out of the warehouse by May 8, 2016, sixteen months prior to the Storage Pricing Agreement's September 1, 2017 termination date.

There is also clear evidence of the damages sustained as a result of Watkins' breaches of contract.  As noted above, and set out in detail in the Verified Complaint and Affidavit of Kristen Connell, an initial analysis of Jofran's damages incurred to date totals $658, 301.  Id. at ¶ 97.

**b.  Breach of the Implied Covenant of Good Faith and Fair Dealing**

Jofran also has a likelihood of success on its breach of the implied covenant of good faith and fair dealing claim.  "Every contract implies good faith and fair dealing between the parties." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991)   This implied covenant means that neither party may do anything that will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract.  Id.  The duty of good faith and fair dealing concerns the parties performance of the contract.  See Hawthorne's Inc. v. Warrenton Realty, Inc., 414 Mass. 200, 211 (1993).  The purpose of the contract is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.  See Cadle Co., v. Varagas, 55 Mass. App. Ct.  361, 33 (2002).  Any effort to extort a new pricing structure is a breach of the covenant of good faith and fair dealing. Anthony's Pier Four, 411 Mass. at 458.  Furthermore, any attempt to rescind a contract that is really an effort to extract a price concession is a breach of the covenant.  Northern Heel Corp. v. Compo Indus., Inc., F.2d 456, 471 (1st Cir. 1988).  Watkins has violated each of these covenants.

Here, Watkins breached the covenant of good faith and fair dealing in multiple ways. First, Watkins entered into a two-year Storage Pricing Agreement with Jofran and then moved Jofran's inventory to a warehouse where Watkins only had a month-to-month lease without any disclosure of this short lease term to Jofran.  Verified Compl., ¶¶ 87-89.  This put Jofran at risk of having to find a new warehouse if Watkins either received notice from the landlord or chose on its own to terminate the warehouse lease.  In fact, this is exactly what happened.  Id. at ¶¶ 92-93.

 In addition, Watkins' performance under the 2015 Storage Pricing Agreement was abysmal. After failing to correct the invoicing problems created by its own conduct, Watkins

falsely accused Jofran of breaching the 2015 Storage Pricing Agreement, sought to rescind the Storage Pricing Agreement without legitimate grounds to do so, and then made it abundantly clear that it would only perform the already-contracted-for services if Jofran paid Watkins more money pursuant to a new contract. Id. at ¶¶ 58-69, 80-81. After Jofran rightfully declined, Watkins advised Jofran that the Hemlock Avenue warehouse's landlord had triggered the 60-day termination provision in Watkins' lease and that Jofran had to find someone else to store and service its inventory and be out of the warehouse by May 8, 2016, sixteen months prior to the 2015 Storage Pricing Agreement's termination date. Id. at ¶¶ 92-93. Watkins' stated reasons for rescinding the 2015 Storage Pricing Agreement and ending its contractual obligations to Jofran were nothing more than pretext. Id. at ¶ 90. Watkins' true motivation for rescission was its desire to get out of a business deal that had turned out to not be profitable for Watkins, as it prepared for the June 1, 2016 acquisition by Schneider National, Inc. Id.

All of this conduct, including the actions described in the breach of contract section above, destroyed Jofran's right to receive the benefits of the 2015 Storage Pricing Agreement in violation of the implied covenant of good faith and fair dealing. The two-year 2015 Storage Pricing Agreement was supposed to provide Jofran with cost-effective and dependable warehousing and servicing of its inventory, and confidence that its inventory would reach its customers with timeliness and accuracy. As a result of Watkins' conduct, however, the service to Jofran's customers was severely disrupted. Regular customers were unable to place and pick up orders and could not count on their orders from Jofran being accurate. Watkins' conduct also forced Jofran to find a new warehouse to store and service its inventory sixteen months before it should have had to do so under the 2015 Storage Pricing Agreement. Id. at ¶ 93. The time constraints of the move put Jofran at a disadvantage with respect to negotiating the most

financially advantageous agreement it could and limited Jofran's options, something that would not have been the case if Watkins had performed under the 2015 Storage Pricing Agreement.  Id. at ¶ 94.  In addition, by refusing to take additional containers even before the warehouse needed to be vacated, Watkins forced Jofran to reroute containers already set to be unloaded at the Hemlock warehouse.  Id. at ¶ 86.

Relocating inventory as voluminous as Jofran's is no small task, as evidenced by the 2015 Storage Pricing Agreement's non-renewal provision, which provides that notice of termination must be given at least six months prior to the yearly automatic renewal date.  See Verified Complaint, Ex. B.  Had Watkins' performed under the Storage Pricing Agreement, Jofran would have had at least six-months' notice of its need to find a new warehouse.  Watkins deprived Jofran of both the services Jofran had contracted to receive under the Storage Pricing Agreement and the certainty a two-year agreement was meant to provide, thereby violating the implied covenant of good faith and fair dealing.

### III. JOFRAN WILL LIKELY SUFFER IRREPARABLE HARM IF THE REQUESTED RELIEF IS DENIED

A plaintiff experiences irreparable injury if there is not adequate remedy at final judgment.  GTE Prods., 414 Mass. at 724; Weaver v. Hedersen, 984 F.2d 11, 12 (1st Cir. 1993). In determining harm to a plaintiff in the absence of an injunction, "the court need consider only the harm that would not be redressed by final relief."  GTE Prods., 414 Mass. at 724; see, e.g., St. Paul Fire & Marine Ins. Co. v. Ellis & Ellis, 951 F. Supp. 5, 6-7 (D. Mass. 1996).  In St. Paul, the Court issued a preliminary injunction, holding that:

> [The Plaintiff] is entitled to reasonable security that its claim will not be made worthless, despite its merits because prior to the conclusion of the case the defendant's assets should be dissipated. On the other hand, a freeze of an appropriate amount of assets of

the defendants would not impose any greater or substantial harm
on them; it would only serve to preserve the status quo.

St. Paul Fire & Marine Ins. Co., 951 F. Supp. at 6-7, see also, Fleet Nat'l Bank. v. Rapid

Processing Co., Inc., 643 F. Supp. 1065, 1066 (D. Mass. 1986) (where an action for damages

would be inadequate because defendant's assets are in danger of depletion or dissipation, a

preliminary injunction may be appropriate); Boston Athletic Ass'n v. International Marathons,

Inc., 392 Mass. 365, 362 (1984) (court did  not abuse discretion in granting preliminary

injunction motion where harm to plaintiff  if injunction did not issue was risk that defendant

would dispose of funds prior to determination on merits).

If the requested injunction and restraining order is not granted, there is a substantial risk that

Jofran will suffer irreparable harm.  Schneider National, Inc.'s recent acquisition of Watkins is

likely to lead to the transfer and/or depletion of Watkins' assets to the point that any judgment

Jofran eventually obtained against Watkins would not be collectable.  Through this motion,

Jofran seeks to avoid the otherwise likely scenario that, after succeeding on the merits of its

claims against Watkins, Jofran would be unable to collect on a significant judgment.  Jofran has

already sustained significant damages as a result of Watkins' conduct and seeks to avoid

incurring the high costs of litigating a complex commercial case such as this, only to learn that it

cannot collect any damages awarded.  Under the circumstances, the risk of Jofran not being able

to collect on a judgment is substantial.

## IV.    THE HARM JOFRAN SEEKS TO AVOID FAR OUTWEIGHS ANY INCONVENIENCE THE INJUNCTION MIGHT CAUSE WATKINS

The irreparable harm Jofran seeks to avoid far outweighs any risk of harm or

inconvenience an injunction and restraining order might cause Watkins.  Watkins is a large

national company, presumably with substantial assets.  Ensuring that assets in the amount of

$658,301 are preserved to satisfy a judgment obtained against it in this case would impose a minimal burden on Watkins.

## V.        MOTION FOR APPROVAL OF TRUSTEE PROCESS ATTACHMENT

In light of the risk that the recent sale of Watkins to a third party will lead to the transfer and/or distribution of Watkins' assets, Jofran also seeks an Order attaching by trustee process all of the goods, effects and credits of Watkins in the hand of the trustee process defendant, The PNC Financial Services Group, Inc. ("PNC"), in the amount of $658,301.  Upon information and belief, Watkins maintains a bank account at PNC Bank, New Jersey, a subsidiary of The PNC Financial Services Group, Inc.  Verified Compl., ¶ 141.  Until Watkins severed its relationship with Jofran earlier this year, Jofran remitted payment to Watkins via electronic transfers to this bank account.  Id. at ¶ 142.    Jofran has meritorious causes of action against Watkins and there is a reasonable likelihood that a judgment will be recovered in the amount of at least $658,301.  Id. at ¶ 143.  Upon information and belief, Watkins' PNC account contains funds that would satisfy, at least in part, the judgment Jofran expects to obtain against Watkins.  Id. at ¶ 144.  Jofran is unaware of any insurance coverage which would satisfy a judgment in this matter.  Id. at ¶ 145.  Given the recent acquisition of Watkins by Schneider National, Inc., there is a reasonable likelihood that, unless the attachment is granted, Watkins will transfer the funds in the account.  Id. at ¶ 146.

## **CONCLUSION**

For the foregoing reasons, the plaintiff, Jofran Sales, Inc., respectfully requests that this

Honorable Court issue the following:

a.  A preliminary injunction preventing Watkins from depleting and/or distributing assets

in the amount of $658,301 which would satisfy the minimum judgment Jofran

expects to obtain against Watkins in this civil action.

b.  An Order attaching by Trustee Process all of the goods, effects and credits of Watkins

in the hands or possession of PNC in the amount of $658,301 and direct the clerk to

issue a summons in the form attached hereto.


                                        JOFRAN SALES, INC.
                                        By its attorneys,


                                        Jennifer R. Kiefer
                                        Maureen Mulligan, BBO #556482
                                        Jennifer R. Kiefer, BBO #670033
                                        Peabody & Arnold LLP
                                        Federal Reserve Plaza
                                        600 Atlantic Avenue
                                        Boston, MA  02210-2261
                                        Tel. (617) 951-2100
                                        Fax. (617) 951-2125
                                        mmulligan@peabodyarnold.com
                                        jkiefer@peabodyarnold.com


Dated: June 21, 2016

958010_1
16190-200176

<u>CERTIFICATE OF SERVICE</u>

I, Jennifer R. Kiefer, attorney for plaintiff, Jofran Sales, Inc., hereby certify this 21st day of June, 2016 that I efiled and will serve a copy of the foregoing document on all parties of record.

/s/ Jennifer R. Kiefer
Jennifer R. Kiefer