UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOFRAN SALES, INC., <br><br>         Plaintiff, <br><br> v. <br><br> WATKINS AND SHEPARD TRUCKING, INC., <br><br>         Defendant, <br><br> and <br><br> THE PNC FINANCIAL SERVICES GROUP, INC., <br><br>         Trustee Process Defendant. | CIVIL ACTION NO. |

**AFFIDAVIT OF KRISTEN CONNELL IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, RESTRAINING ORDER, AND TRUSTEE PROCESS ATTACHMENT**

I, Kristen Connell, hereby depose under oath and state as follows:

1. I make this Affidavit based on my personal knowledge.

2. I have been the Chief Financial Officer for the plaintiff, Jofran Sales, Inc. ("Jofran") since 2010. I have also served as Jofran's Director of Operations since June 2015.

3. I earned my Bachelor of Arts, Economics, from Brown University in 1993.

4. I have been a Certified Public Accountant since 2003.

5. My responsibilities at Jofran include:

   a. Reporting to and working directly with the President and CEO on short term / long term corporate strategic planning, succession planning and operational performance.

b. Reviewing and presenting monthly internal statements, quarterly consolidated financial statements, annual consolidated financial statements, and audit package.

c. Performing monthly financial analysis with related reporting for the President and CEO.

d. Developing comparative financial models to advise ownership on strategic direction and operational efficiency.

e. Financial, HR, and regulatory reporting functions in domestic and overseas offices.

f. Corporate liaison with banks, lenders, United States and Asian legal teams, outside auditors, and various key vendors.

g. Oversee compliance activities related to customer requirements including documentation, shipping, and electronic data interchange requirements.

h. Managing and training team responsible for all accounts receivable, accounts payable, payroll, and collections functions.

6. Prior to my employment with Jofran, I was an audit manager at the accounting firms KLR and Sullivan, Shuman, Freedberg, where I provided assurance and tax services for a variety of clients, including importer/wholesalers, distributors, online retail, and manufacturers. The assurance services I provided included compilation, review, and audit level engagements with entities ranging from $1 million to $500 million gross revenue.

7. Based on my professional training and experience, I created the damages summary attached to the Verified Complaint as Exhibit J, as well as the spreadsheets attached to the Verified Complaint as Exhibits K-R, which provide detailed breakdowns of each category of damages incurred due to Watkins' conduct at issue in the Verified Complaint.

8. As set forth in Exhibit J to the Verified Complaint, an initial analysis of Jofran's damages incurred to date totals $658,301. This amount is based on Jofran's initial calculations of its minimum damages and is likely to increase.

9. Jofran's damages include at least $105,055 in various charges related to Watkins' delayed warehouse opening and failure to empty import containers in a timely fashion. These charges are container detention charges, excess chassis rental, bobtail fees, and excess fuel surcharges. Container detention charges (or per diem charges) are a per day fee charged by the ocean freight carrier if the empty container is not returned to port within the contractual period of time (or "free days"). Jofran's free days are 10 business days. If the empty container is not returned to port, Jofran is charged a per day rental/late fee, beginning on day 11, until the container is returned. Bobtail charges are fees from a trucking company (or dray/drayage company) when they travel one-way without a load. Jofran coordinates with the trucking company to drop off a full container, and pick up an empty container to avoid this charge. This fee is not incurred when the trucking company

is able to haul a load in both directions. As a result of Watkins' delayed opening and failure to empty containers, bobtail fees were charged to Jofran for the trucking companies' one-way container deliveries or pickups. Fuel surcharges are standard fuel fees added to all trucking charges. Fuel surcharges listed in Exhibit K pertain only to the related bobtail charges. Excess chassis rental charges are a per day rental fee of the trucking company's chassis, upon which the containers are placed. It is necessary to place containers on chassis to enable truck transport. Charges incurred past 10 days are in excess of the maximum time when the container should be emptied and returned and were caused by Watkins' delayed opening. A detailed breakdown of the damages incurred due to the delayed opening is attached to the Verified Complaint as Exhibit K.

10. Entries 1-41 for Wolf's Trucking and Morgan Southern in Exhibit K represent bobtail fees charged to Jofran for the trucking company dropping a full container without picking an empty container up, or vice versa, caused by the lack of empty containers to marry with the other side. The bobtail charges were caused Watkins' delayed opening and failure to empty containers in a timely fashion.

11. Entry 42 in Exhibit K, for Morgan Southern, represents excess fees charged for chassis rental in excess of the days allowed to return an empty container. The excess chassis fees are due to Watkins' delayed opening and failure to empty containers in a timely fashion.

12. Entries 43-44 in Exhibit K, for Hapag, represent detention (per diem) fees charged for the late return of an empty container, and bobtail fees to pick up the empty container without a dropping off a full container in the same trip. These charges are due to Watkins' delayed opening and failure to empty containers in a timely fashion.

13. Entries 45-66 in Exhibit K, for Wolfs, represent per diem, chassis, bobtail, and fuel surcharge fees charged to Jofran due to Watkins' delayed opening and failure to empty containers in a timely fashion.

14. Entries 67-84 in Exhibit K, for Morgan Southern, represent per diem or chassis fees charged for the late return of an empty container and chassis rental in excess of the 10 free days. These charges are due to Watkins' delayed opening and failure to empty containers in a timely fashion.

15. Entries 85-88 in Exhibit K, for Hapag, represent per diem fees charged for days in excess of the 10 free days for which an empty container was not returned to port. These charges are due to Watkins' delayed opening and failure to empty containers in a timely fashion.

16. Jofran's damages also include at least $16,959 in lost and/or damaged inventory. A detailed breakdown of the damages incurred due to lost and/or damaged inventory is attached to the Verified Complaint as Exhibit L.

17. I made the calculations in Exhibit L by adding up the adjustments made by Jofran to match Jofran's inventory records to inventory quantities reported by Watkins. In addition, adjustments were made to actual inventory quantities after Jofran moved to a new warehouse. The adjustments made after the move to a new warehouse were based on quantity counts/verification while unloading inventory into the new warehouse. The net

loss of inventory was due to unrecovered inventory due to Watkins' failure to properly handle, store, and account for inventory.

18. Jofran's damages also include at least $55,901 in moving expenses. A detailed breakdown of the damages incurred as a result of the move is attached to the Verified Complaint as Exhibit M.

19. I made the calculations in Exhibit M by adding charges to Jofran from trucking companies to move the inventory from the Watkins warehouse to Jofran's new warehouse provider. I also added charges to Jofran from Watkins for loading trucks (out fees), and use of pallets to load the trucks (pallet fees). I also added the preliminary charges to Jofran to integrate computer systems with the new warehouse provider to allow information to be transmitted electronically as it was with Watkins.

20. Jofran's damages also include at least $12,288 due to shipping issues and customer chargebacks to Jofran resulting from Watkins' errors. On multiple occasions, Jofran was charged fees by its customers when they had to wait for orders at the warehouse, come back later, or take incomplete shipments because Watkins was not ready to ship. A detailed breakdown of these damages is attached to the Verified Complaint as Exhibit N.

21. I made the calculations in Exhibit N by adding up the customer charges to Jofran for Watkins-related errors at the Hemlock Avenue warehouse. Nebraska Furniture Mart charged Jofran for the cost of empty space on a truck when Watkins failed to properly load their truck with orders during a scheduled appointment. Nebraska Furniture Mart, Tuesday Morning and HomeGoods charged Jofran for loading orders incorrectly – either over (shipped too much) or under (short – missing cartons on the order). Worthington, HomeGoods, and Marshalls charged Jofran for driver detention. Driver detention is incurred when a truck driver is detained beyond their schedule appointment time due to Watkins' failure to load the truck during their scheduled appointment. HomeGoods charged Jofran for shipping costs incurred by HomeGoods when Watkins loaded another customer's order onto their truck.

22. Jofran's damages also include at least $8,282 in travel expenses. Jofran representatives were forced to travel to California to address the warehousing, shipping, and invoicing issues at the Hemlock Avenue warehouse, to find a new facility to store and service Jofran's inventory, and to oversee the move of Jofran's inventory from the Hemlock Avenue warehouse to a new facility. A detailed breakdown of the travel expenses incurred is attached to the Verified Complaint as Exhibit O.

23. Jofran's damages also include at least $19,308 in damages to due billing errors. A detailed breakdown of these damages is attached to the Verified Complaint as Exhibit P.

24. The "Storage" chart in Exhibit P reflects the storage fees originally billed to Jofran by Watkins pursuant to the 2015 Storage Pricing Agreement based on Watkins' inaccurate inventory information for each month from September 2015 through January 2016, and the storage fees actually owed to Watkins under the Storage Pricing Agreement based on

the inventory information verified by Jofran. These calculations reflect that Watkins overcharged Jofran by $33,939.14.

25. The "In Charges" chart in Exhibit P reflects the "in charges" originally billed to Jofran by Watkins for inventory entering the Hemlock Avenue warehouse for each month from September 2015 through January 2016, and the "in charges" actually owed to Watkins under the 2015 Storage Pricing Agreement based on the inventory information verified by Jofran. These calculations reflect that Watkins undercharged Jofran by $14,630.77.

26. I reached the conclusion in Exhibit P that Watkins owes Jofran $19,308.37 by subtracting the $14,630.77 amount Watkins undercharged Jofran for "in charges" from the $33,939.14 Watkins overcharged Jofran for storage.

27. Jofran's damages also include at least $84,000 in increased storage costs. Jofran's agreement with the new warehouse facility that replaced Watkins in April 2016 is more costly to Jofran than the Storage Pricing Agreement it had negotiated with Watkins, had Watkins performed as agreed under the two-year term of the Storage Pricing Agreement. A detailed breakdown of the increased storage costs is attached to the Verified Complaint as Exhibit Q.

28. I made the calculations in Exhibit Q by calculating the difference in storage charges for a minimum cubic foot rate of 150,000 under Jofran's 2015 Storage Pricing Agreement with Watkins ($0.18 per cube) and Jofran's storage contract with its new warehouse provider, Wiseway ($0.22 per cube). Warehouse storage is calculated by the amount of space Jofran's inventory occupies. Cubic feet are the unit of measure for that space. Under Jofran's 2015 Storage Pricing Agreement, the minimum monthly storage charge (rent) is 150,000 cubic feet at the rate of $0.18 per cubic foot, or minimum rent of $27,000. The storage space under the Wiseway contract and rates is a minimum monthly rent of $32,250. This revealed an increase in storage costs of $5,250 per month under the Wiseway contract. I then multiplied $5,250 by 16, the number of months remaining on Jofran's Storage Pricing Agreement with Watkins when Jofran was forced to switch to Wiseway, to reach a total increased storage costs of $84,000. The actual increased storage costs are likely to exceed this amount, as Jofran expects to exceed the minimum 150,000 cube rate on a regular basis.

29. Jofran's damages also include at least $356,507 in lost net profit. Jofran has several customers who pick up orders on a weekly basis. During the time period when the warehouse was not open, these weekly pickups did not happen, resulting in lost sales. Other Jofran customers advised that they wanted to purchase more product from Jofran, but that they would not do so because of Watkins' conduct and unreliability. A detailed breakdown of lost net profit is attached to the Verified Complaint as Exhibit R.

30. The analysis contained in Exhibit R is a comparison of two net profit statements: actual net profit at the Hemlock Avenue warehouse compared to an adjusted net profit of what the Hemlock Avenue warehouse should have yielded if Watkins had properly performed its obligations. The difference between those two amounts leads to the lost net profit amount of $356,507. One of the most impactful problems with Watkins' non-functioning

California warehouse was the deficiency of shipments to our customers. Jofran's strategic advantage over its competitors is its large inventory stock and its commitment and ability to ship orders within 48 hours of order receipt.

31. To determine lost profits, the first step was selecting the most appropriate analysis to employ. There are two standard approaches to a lost net profit calculation: the "yardstick" approach and the "before and after" approach. The "yardstick" approach is a comparison of like-kind operations. The "before and after" approach compares months of performance to months of non-performance. For purposes of the "yardstick" approach, the closest comparison to the Hemlock Avenue warehouse would be Jofran's Washington warehouse, which had common factors of 3PL provider (Watkins) and region (West coast). However, a full "yardstick" approach using the Washington warehouse would not be appropriate in this circumstance. Jofran relocated to Southern California specifically to cater to customers who have distribution hubs in the Los Angeles area. The proximity to these hubs and the larger warehouse (where more inventory could be warehoused) were the express reasons Jofran relocated to California. Given those facts, the composition of the customers and volume of shipments from the California warehouse and the Washington warehouse were too different for the "yardstick" method to be appropriate. Therefore, I utilized the "before and after" method.

32. While I selected the "before and after" method over the "yardstick method," I did compare historic data from the Washington warehouse to ensure there was no seasonality that should be taken into account. Over the last two years in Washington, shipping was consistent without any apparent seasonal trends.

33. The "before and after" method is an analysis which compares what happened when the warehouse was performing against months of non-performance. Months of performance are characterized by both availability of inventory and Watkins shipping orders within the orders "ship by" (due by) dates. To make this comparison as accurate as possible, four distinct revenue streams were separately analyzed: (1) small-medium retailers who ship within 48 hours; (2) big box retailers; (3) weekly pick up retailer Living Spaces; and (4) weekly pick up retailer Nebraska Furniture Mart. The first three of these revenue streams do not order or pick up out of Jofran's other domestic warehouses, so the lost profit analysis focuses on revenue. However, the last revenue stream, Nebraska Furniture Mart, was accommodated from Jofran's Massachusetts warehouse facility during the months of Watkins' non-performance in California. Therefore, the lost profit analysis for Nebraska Furniture Mart compares only the inventory costs, which are higher in Massachusetts.

34. After determining the separate revenue streams, average revenue and cost of goods sold was calculated for months of performance (*i.e.*, when the California warehouse was, despite the inventory and shipping errors, operational). For small-medium retailers, the average month was based on months of performance November 2015 – April 2016. For big box retailers, the average month was based on months of performance November 2015 – March 2016. For Living Spaces, the average month was based on months of performance November 2015 – May 2016.

35. The last step in the lost net profit analysis was comparing average revenue and cost of goods sold during months of performance to months of non-performance. For small-medium retailers, months of non-performance were September 2015, October 2015, and May 2016. For big box stores, months of non-performance were September 2015, October 2015, April 2016, and May 2016. For Living Spaces, months of non-performance were September 2015 and October 2015. Months of non-performance for Nebraska Furniture Mart were September 2015, October 2015, January 2016, and May 2016. The difference between the average month and the non-performance month represents the "adjustments" to revenue (highlighted in green), and their related cost of goods sold (also highlighted in green). For Nebraska Furniture Mart, the adjustment is not revenue, but only lost profit margin on shipments from Massachusetts during months of non-performance in California.

36. Following this analysis, Exhibit R reaches the conclusion that Jofran has sustained at least $356,507 in lost net profit due to Watkins' conduct.

Signed under the pains and penalties of perjury this 21st day of June, 2016

*Kristen Connell*
Kristen Connell, CPA, CGMA
Chief Financial Officer and Director of Operations
Jofran Sales, Inc.

959657_1
16190-200176

<u>CERTIFICATE OF SERVICE</u>

I, Jennifer R. Kiefer, attorney for plaintiff, Jofran Sales, Inc., hereby certify this 21st day of June, 2016 that I efiled and will serve a copy of the foregoing document on all parties of record.

/s/ Jennifer R. Kiefer
Jennifer R. Kiefer